DENNIS R. BAGNERIS, SR., Judge.
| T Defendant Wayne Taylor appeals his conviction for unauthorized entry of a place of business. Finding merit to defendant’s assignment of error questioning the sufficiency of the evidence to sustain defendant’s conviction, we hereby reverse the defendant’s conviction and sentence.
STATEMENT OF THE CASE
Defendant Wayne G. Taylor was charged by bill of information on November 4, 2011 with two counts of simple burglary, violations of La. R.S. 14:62. Defendant pleaded not guilty at his December 5, 2011 arraignment. On the first morning of trial, August 14, 2012, the trial court granted defendant’s motion in limine, barring reference to, testimony or evidence as to, prior crimes committed by defendant. The court also ruled that the State could introduce evidence of an incul-patory statement made by defendant. Trial by a six-person jury was held on August 14-15, 2012, at the conclusion of which defendant was found guilty of unauthorized entry of a place of business as to Count One and not guilty as to Count Two. The trial court denied defendant’s motion for new trial on September 5, 2012. On November 7, 2012, the trial court sentenced defendant to six years at hard labor. Defendant now appeals this final judgment.
[.FACTS
Defendant was charged with simple burglary in Count One and convicted as to Count One of the lesser offense of unauthorized entry into a place of business.
Plaquemines Parish Sheriffs Office Detective Paul Durnin testified that in January 2011 he investigated a burglary at what was referred to as “the state school complex” or “the state school,” located at 251 F. Edward Hebert Blvd., in Plaque-mines Parish. Some contractors working at the site reported that the power was off and that a quantity of copper wire had been removed from one building at the site. He said a blue cigarette lighter was found at the scene, along with a pole normally used to shut off electricity. He testified that the Louisiana State Police Crime Lab obtained DNA from the lighter that matched defendant’s DNA profile in the “CODIS” system.
Det. Durnin also investigated a similar burglary the next month, February 2011, at the same location. The sheriffs office *441 was notified of the burglary on February 8, 2011. He and Detective Brett Ricks went to the scene the following day, February 9, 2011. Blood evidence collected in the February 2011 burglary was also DNA matched to defendant. It was at that time that an arrest warrant was obtained for defendant, but defendant was not arrested for several months. In the course of his investigation Det. Durnin did not find any indication that defendant had authority to be at the state school; that defendant was employed by the Plaquemines Parish government (“PPG”); or that he worked for a contractor for the PPG. Det. Durnin was present when defendant was booked and advised of his | ^Miranda[1] rights. Defendant refused to give a statement. Det. Ricks asked defendant if he had ever been to Plaquemines Parish, and defendant replied that he had not. Buccal swabs were taken from defendant in April 2012, and Det. Durnin confirmed that a DNA profile produced from those swabs matched defendant’s DNA profile produced from the evidence collected after both the January and February 2011 burglaries.
Det. Durnin confirmed on cross-examination that Orleans Parish was right behind the state school defendant was accused of burglarizing. Det. Durnin admitted that no copper was found on defendant’s person, and that they had found no record of any copper sales by defendant at area scrapyards. When asked what evidence there was that defendant had stolen copper, Det. Durnin cited the DNA evidence. When asked whether there was any fence on the property, Det. Durnin replied that there was only a ditch. He did not remember there being any “No Trespassing” signs on the property.
Retired Plaquemines Parish Sheriffs Office Lt. Ken Harvey testified that prior to his retirement, from 2005 to July 1, 2012, he was the “evidence officer” for the office, responsible for securing evidence, picking it up, taking it to the crime lab, and storing it. He testified generally to chain-of-custody procedures in the sheriffs office. He identified a chain-of-custody receipt reflecting that he picked up evidence in the case on January 17, 2011, under item #A-11-00681. He also identified a similar receipt reflecting evidence received by him on February 9, 2011, under item # A-ll-01656.
Plaquemines Parish Sheriffs Office Deputy Melanie Zito testified that she became the evidence custodian on August 13, 2012' — the day before she testified at |4the trial. She succeeded retired Lt. Ken Harvey and was responsible for taking the evidence to trial.
Det. Lt. Brett Ricks, with the Plaque-mines Parish Sheriffs Office, investigated the February 2011 burglary at the state school on F. Edward Hebert Blvd. He circled on State Exhibit 2, a blow-up of an aerial photograph of the state school complex, the building complex that was the subject of his investigation on February 9, 2011. He referred to it as the “Beech Grove Complex.” It was composed of what appeared to be five buildings all connected to each other, along with two buildings standing alone. The aerial photograph showed a vast overall complex of multiple building complexes, five similar to the Beech Grove Complex, and some stand-alone buildings, including one right off of F. Edward Hebert Blvd. marked “251,” at what appeared to be the main entrance to the overall complex. The Beech Grove Complex was at the rear of the overall complex, farthest away from F. Edward Blvd.
*442 Det. Ricks identified photographs of blood evidence found in the interior of “one of those buildings” that comprised the Beech Grove Complex. The photographs depict blood evidence on light-colored, speckle-patterned, linoleum floor tiles. Samples of that blood evidence were collected. He said one spot of blood was approximately twenty-five to thirty feet away from an exterior wall that had been pulled down, the location of which he identified with a yellow square. Det. Ricks identified a photo of a door that was almost pulled off, and he confirmed that was where he believed defendant gained entrance. When asked whether he considered that a classic forced entry, Det. Ricks replied in the affirmative. Det. Ricks also identified photographs of the inside of the Beech |sGrove Complex showing severed electrical wires and electrical conduit pipe. Electrical wiring had been removed from inside the conduit.
In the course of Det. Ricks’ investigation he contacted the human resources department of the PPG, and no one could verify that defendant worked for the parish. He did not find any information that defendant worked for a contractor for the parish or that he had permission to be in that facility or the burglarized facility where his blood was found. When arrested, defendant was advised of his Miranda rights and refused to make a statement. Det. Ricks asked defendant if he could ask one question, and defendant replied in the affirmative. When Det. Ricks subsequently asked defendant if he had ever been in Plaquemines Parish, defendant replied in the negative. Det. Ricks identified evidence bags relating to blood samples collected at the scene on February 9, 2011, and he stated that he had sealed those bags, as well as an evidence bag containing buccal swabs taken from defendant in April 2012.
Det. Ricks admitted on cross-examination that the sheriffs office found no leads on the location of the copper stolen from the state school. He said no fingerprints were found on what appeared to have been a remote vehicle accessing device with a lock/unlock feature and a panic button that was found at the scene. Det. Ricks admitted that on February 13, 2011, a black male was seen exiting a truck on the state school complex, and he fled before being questioned. Det. Ricks confirmed for the record that defendant was a white male. There was also a call made to the sheriffs office by a parish employee reporting a truck at the state school with three males inside. A temporary license tag number on the truck was traced to a dealership that that had some temporary tags stolen, and that tag number was never linked to anyone.
| fiDet. Ricks admitted on cross-examination that between 2003 and 2012 there had been twenty-three other complaints filed with the sheriffs office relating to the state school complex. Det. Ricks read a comment concerning a complaint call made to the sheriffs office by PPG Director of Operations Scott Lott. In the call Mr. Lott reported to the sheriffs office that he needed a deputy at the state school to deal with three subjects in truck. The comment was that there had been a lot of break-ins and thefts at that location. Det. Ricks testified that he did not know who had made the comment about the thefts and break-ins, whether it was Mr. Lott or the call-taker. Det. Ricks noted that of the recorded twenty-four complaint calls to the sheriffs office from 2003-2012 relating to the state school complex, only one had involved a burglary. Mr. Lott’s call was made after the two burglaries for which defendant was being tried were committed.
Leslie Son, Ph.D, was qualified by stipulation as an expert in forensic DNA analy *443 sis. Dr. Son was employed by the Louisiana State Police Crime Laboratory. She identified a report, SP-001992-11, relating to DNA profiles obtained from two eviden-tiary blood samples and a DNA profile obtained from a reference sample taken from defendant. The same DNA profile was derived from each blood sample and was subsequently compared to a DNA profile derived from the reference sample from defendant. Dr. Son said the two DNA profiles from the blood were “consistent” with the DNA profile obtained from the reference sample from defendant.
Dr. Son testified on cross-examination that all thirteen of the widely accepted alleles used for comparison purposes matched in the three DNA profiles. She admitted that each person had more than thirteen alleles — an unknown number |7of them — and that she had not matched that unknown number of alleles to defendant.
Bert Hepting testified that he was a pump mechanic with Severn Trent Environmental Services, and that he was familiar with the facility referred to as the state school. He was working for Severn Trent in January 2011 at the state school one Monday when he discovered that there was no power to a lift station, where there had been power the previous Friday. He found that electrical lines had been pulled out of two buildings, and a transformer in one of those also had been damaged. Mr. Hepting identified the aerial view of the property, the two buildings from which he found wire was missing. This was in a different complex than the Beech Grove Complex, which was the complex that had been the subject of the February 2011 break-in that Det. Ricks investigated. Mr. Hepting said he had never seen defendant before.
James Madere, a geographical information mapping analyst for the PPG, identified some buildings as ones he was using in February 2011 for archival records storage. These buildings were at the far end of the bottom of the somewhat U-shaped Beech complex location where Det. Hicks had indicated that a portion of an exterior wall had been torn down. Mr. Madere confirmed that in February 2011 he was securing the four access doors of those buildings with standard installed keyed locks. He had one key, and a maintenance man had the other. On what defendant represents and thereby admits in his appellate brief was February 8, 2011, Mr. Madere discovered that a locked door to the building had been pried open. Mr. Madere identified on a photograph damage done to the building that he confirmed had not been present a couple of days prior to when he discovered it. He also confirmed that when he locked the complex a couple of days prior to |sFebruary 8, 2011, the building had electricity. He did not know defendant and he had not given defendant permission to enter the building, strip wire, and leave blood on the floor.
The prosecutor showed Mr. Madere a series of photographs “just to make sure we’re talking about the same place.” Mr. Madere confirmed that one photograph was of “the buildings” they had been talking about. He confirmed that on that photo was one of the doors he had locked. He confirmed that he entered that building and saw damage inside. He confirmed that at least five photos depicted some of the interior damage he found that day inside the same building(s).
Mr. Madere testified on cross-examination that Scott Lott was in charge of the state school facility. Mr. Madere had only been in control of “one structure” that he had been granted permission to use for storage. He was not aware of any “No Trespassing” signs on the property. He had not seen a fence on the property. Mr. Madere testified that all parish employees *444 having access to the state school complex had been asked to report anything out of the ordinary, relative to vandalism.
Scott Lott, the Director of Operations for the PPG at the time of trial and during the period of time at issue, confirmed that in both the January 2011 and February 2011 incidents he received phone calls from Severn Trent employees reporting that they had no power when they had power a couple of days prior thereto. They reported that it appeared someone had broken in, cut some wire, and removed it. Mr. Lott went to the scene, at least the scene of the February 2011 break-in, and observed that electrical wire had been cut and removed. Mr. Lott did not recognize defendant; he had never given defendant permission to enter the |9buildings and did not give him permission to strip out copper wire from the buildings.
Mr. Lott testified that on February 13, 2011, subsequent to the February 2011 theft, he was driving around the area during daylight hours when he noticed a truck entering the state school complex. He proceeded behind the vehicle and called the sheriffs office to report this. The truck stopped at one point and the driver, a black male, exited — there was also a front seat passenger and a passenger in a rear seat. Mr. Lott asked the driver what they were doing there, and the driver replied that they were going fishing. When Mr. Lott asked the driver where the fishing poles were, the driver replied that all they were doing was looking for a fishing spot. Mr. Lott then informed the driver that he was on the telephone with the sheriffs office and that when deputies arrived, the driver could explain to them that he and his companions were looking for a fishing spot. At that point the man jumped back into his truck and drove off. Mr. Lott followed the truck all the way back into ■ Orleans Parish, where he lost sight of the truck in a residential neighborhood. He was able to get the number of a temporary license plate located in the rear window.
Mr. Lott confirmed on cross-examination that he did not know whether the sheriffs office was able to determine the ownership of the temporary license plate that had been on the truck he had followed from the state school complex on February 13, 2011. Mr. Lott stated that there had been complaint calls made regarding the state school complex, regarding people trespassing, hunting, breaking in, burglarizing the property, cutting and removing wire. Mr. Lott said that at the time of these incidents there were “No Trespassing” signs across the front of the premises. Mr. Lott, obviously referring to the damage and thefts done | inin January and February 2011, testified that the damage was freshly done because prior to then, the buildings had power.
Plaquemines Parish Sheriffs Office Lt. Tom Morovich Jr. responded to a call at the state school on January 17, 2011. At the scene he observed a door to a transformer station lying on the ground. It appeared that all the lines had been cut inside of the transformer box. Walking around the area he observed a blue Bic cigarette lighter lying in the grass next to that particular building, just past the transformer box, near some tire tracks. He said the way the lighter was positioned on top of the grass blades, and the fact that it did not appear to have any rust on it, he concluded it had been freshly deposited there. He identified the cigarette lighter. He also found a “bushrod,” a tool he said is used to remove fuses from a transformer box, on the ground near the transformer box. He said removing the fuses cuts the connection from the incoming power lines. Lt. Morovich stated on cross-examination that he did not know *445 whether any of defendant’s fingerprints were found on that tool. He said there was no vehicle on the scene.
Det. Durnin, recalled as a witness by the State, testified that the blue Bic cigarette lighter and the “bushrod” or fuse-puller pole were turned over by Lt. Morovich to the sheriffs office evidence custodian. Det. Durnin testified that CODIS was used to match a DNA profile with a person. He stated that when a person is convicted of a felony offense, his DNA profile is entered into the CODIS database. During his investigation he became aware that defendant’s DNA profile was in the CODIS database. He said the “qualifying offense” that resulted in defendant’s DNA profile being placed in the CODIS database was his conviction for the unauthorized entry of a business on March 5, 2008, which he said was listed |non the CODIS match form sent to the sheriffs office by the Louisiana State Police Crime Lab.
Det. Durnin admitted on cross-examination that the only basis for the issuance of the arrest warrant for defendant was the two State Police lab reports stating that defendant’s DNA was found on a cigarette lighter and on blood found at the scene of the burglaries.
Erica Sparacino, a forensic DNA analyst with the Louisiana State Police Crime Lab, was qualified by the court as an expert in forensic DNA analysis. Ms. Sparacino testified that she analyzed a portion of a filter paper from a cigarette butt; a swab taken from a blue cigarette lighter; and a swab from a bundle of copper wire. She stated that a DNA profile obtained from the cigarette lighter was consistent with being a mixture of the DNA of two individuals, one of whom was defendant. She said defendant could not be excluded as a contributor of the DNA in that profile. However, she said it was only three times more likely to be a DNA profile from defendant and a random individual than two unknown unrelated individuals.
Det. Durnin, called as a witness by the defense, testified that he traced the temporary license tag on the vehicle seen by PPG Director of Operations Scott Lott on the state school complex subsequent to the February 2011 burglary at issue to “Jay’s Auto.” Det. Durnin spoke to “Jay” himself, who, the detective recalled, told him that his sister’s boyfriend may have borrowed that temporary tag.
A review of the record reveals no patent errors.
DISCUSSION
In this criminal appeal, defendant argues that the evidence was insufficient to sustain his conviction for unauthorized entry of a place of business.
| i2When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55, citing State v. Hearold, 603 So.2d 731, 734 (La.1992).
This court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the re *446 viewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mus-sall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Huckabay, 00-1082, p. 32, 809 So.2d at 1111, quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107.
13La. R.S. 14:62.4 states, in pertinent part:
A. Unauthorized entry of a place of business is the intentional entry by a person without authority into any structure or onto any premises, belonging to another, that is completely enclosed by any type of physical barrier that is at least six feet in height and used in whole or in part as a place of business.
Thus, to convict a defendant of unauthorized entry into a place of business, the State must prove beyond a reasonable doubt that the defendant: (1) intentionally entered without permission; (2) any structure belonging to another; (3) or premises belonging to another, which premises was completely enclosed by any type of physical barrier of at least six feet in height; and (4) which structure or premises was used in whole or in part as a place of business. La. R.S. 14:62.4; State v. Brown, 08-0661, p. 7 (La.App. 4 Cir. 12/17/08), 3 So.3d 547, 551.
The “intent” required for a conviction of unauthorized entry of a place of business is general intent. See State v. Jacobs, 504 So.2d 817, 821 (La.l987)(stat-ing that the crime of unauthorized entry of a place of business “do[es] not require proof of intent as an essential element of the crime”).
A place of business is defined as a place of employment, occupation, profession, enterprise or commercial activity engaged in for gain or livelihood in which a person shows willingness to invest time and capital on the future outcome. Brown, supra, citing State v. Coleman, 528 So.2d 192, 195 (La.App. 3 Cir.1988).
As for the requirement of a physical barrier at least six feet in height, the Louisiana Legislature enacted La. R.S. 14:62.4 by Acts 1986, No. 635, § 1. As *447 enacted, La. R.S. 62.4 only proscribed an intentional unauthorized entry into “any structure.” By Acts 1999, No. 803, § 1, La. R.S. 14:62.4 was amended to add the prohibition against entry “onto any premises” and to add the phrase “that is completely enclosed by any type of physical barrier that is at least six feet in 114height.” Clearly, the language requiring the com-píete enclosure by any type of physical barrier that is at least six feet in height was intended to apply to the “premises” entered.
Given the wording of the statute, this Court, in an abundance of caution, held in Brown, supra, that a school was “completely enclosed by physical barriers such as walls and doors of at least six feet in height.” 08-0661, p. 7, 3 So.3d at 551. The school, the former St. France Cabrini in New Orleans, was a “structure or premises” within the meaning of La. R.S. 14:62.4, and was described by one police officer as “open and heavily damaged by Hurricane Katrina.” Brown, 08-0661, p. 3, 3 So.3d at 549. At the time of the alleged offense, the school had been purchased by Holy Cross School, and three contractors had been hired to complete work on the site. The defendant was found inside the school with freshly cut copper pipe and a cutting tool on the floor a few feet from him and another individual. The defendant told police that he had been given permission by a “Father Robert” and a FEMA worker to take whatever he wanted. However, he was unsure of the name “Father Robert,” and he was unable to identify the FEMA worker. The Director of Buildings for the Archdiocese of New Orleans testified that, while there were three “Father Roberts” in the archdiocese, none would have had the authority to permit anyone to remove property from the school. He said that if permission had been given to remove copper pipe from the school his office would have been aware of it, and that he was not aware of any such action. This court found in Brown that, even though the school at issue was not functioning ás a school at the time of the unauthorized entry, it was still functioning as a “place of business” within the meaning of La. R.S. 14:62.4. This Court found the evidence | ^sufficient to sustain defendant’s eonviction for unauthorized entry of a place of business.
In the instant case, defendant was convicted as to Count One of unauthorized entry of a place of business. The bill of information charged, in Count One, simple burglary, as stated in the bill of information, “on or between February 4, 2011 and February 7, 2011.” Det. Ricks identified the building he said was the subject of the February 2011 break-in. He took the crime scene photographs of damage to the building and the blood evidence. DNA profiles derived from that blood evidence matched the DNA profile derived from defendant’s known reference sample buccal swab(s). Det. Ricks took the photographs and collected the blood evidence on February 9, 2011. Defendant mistakenly argues on appeal that this blood evidence was found outside and near a collapsed wall. While Det. Ricks testified that one of the blood drops/spots was found approximately twenty-five to thirty feet away from an exterior wall that had been pulled down, at no point did he state that any blood was found outside. To the contrary, he testified that the blood evidence was photographed by him and collected from inside of the building or group of buildings that were the subject of the February 2011 break-in.
State Exhibits 4, 5, and 6 are the color crime scene photographs of blood evidence taken by Det. Ricks, all three printed on paper. All three of the photographs depict blood evidence on what appears to be the *448 same light-colored, speckle-patterned, linoleum tile floor. S-4 and S-5 are obviously photos of the same drop/spot of blood. S-4 depicts almost a full drop/spot, next to one cotton swab with a stained tip. S-5 is a slightly more distant photo of the same drop/spot, with two additional long cotton-tipped swabs with stained tips in the frame. In S-5 the drop/spot of blood apparently has almost been completely absorbed by the 11ficotton-tipped swabs. S-6 depicts two long cotton-tipped swabs with reddish-brown tips, with the tips directly adjacent to a single reddish-brown drop/ spot. However, this photo also depicts other reddish-brown stains on the floor, most of which might be characterized as looking like watery blood smears.
James Madere identified a building of the state school complex that he was using for records storage in February 2011. It was a building in the same interconnected building complex identified by Det. Ricks. He said the building’s four doors were secured with locks. On what defendant represents and thus admits in his appellate brief was February 8, 2011, Mr. Madere discovered that a locked door to the building had been pried open. Det. Ricks identified photographs of an exterior wall to the building that had been almost completely torn down. Mr. Madere identified on photographs damage done to the building that he confirmed had not been present a couple of days prior to when he discovered it. He did not say anything concerning blood on the floor. Mr. Mad-ere did not know defendant, and he had not given defendant permission to enter the building.
The building was known to have had electrical power several days prior to the February 2011 break-in, and thus, according to Scott Lott, the damage inside was “fresh.” Scott Lott did not know defendant and had not given him permission to enter the building. Det. Ricks testified that during his investigation he contacted the human resources department of the PPG, and no one could ascertain that defendant worked for the parish. He did not find any information that defendant worked for a contractor for the parish or that he had permission to be in that facility or the burglarized building where his blood was found.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant 117intentionally made an entry into the building, a “structure,” which, at the time defendant’s blood was discovered there, was being used in whole or in part as a place of business — the storage of archival records of the PPG.
However, more problematic is the issue of proof as to whether defendant’s blood was deposited in the building at a point in time when it was being used in whole or part as a place of business. Defendant asserts in his appellate argument at one point that “[tjhere was no evidence as to when the blood drops were left.” Defendant also asserts in his appellate brief that the State failed to prove that the structures allegedly entered by him “were being operated as a business.”
The evidence established that the PPG acquired ownership of the 341.94-acre state school complex on March 10, 2010, less than one year prior to the alleged unauthorized entry by defendant. There was no definitive evidence presented as to when defendant’s blood was deposited in the building. The only evidence presented at trial from which it might be inferred that the blood had been deposited on the date range alleged in the bill of information, “on or between February 4, 2011 and February 7, 2011,” or even at any earlier point, was that color photographs of the *449 blood drops/spots on the floor showed what appeared to have been an otherwise relatively clean floor. There was also the fact the blood was discovered during an investigation of an unauthorized entry and copper electrical wire theft that was shown to have occurred on or between February 4, 2011 and February 7, 2011. There was no evidence as to when the PPG began using the building for archival records storage, only that it was using it for that purpose at the time of the alleged break-in and theft of copper wire, and discovery of defendant’s blood on the floor.
hsViewing all the evidence in a light most favorable to the prosecution, it could possibly be inferred from common experience that, because the light-colored linoleum tile floor appeared relatively clean— although there was some dirt and scuff marks on it — that the blood drops/spots had been deposited on the floor in the not-too-distant past.
Another bit of evidence was defendant’s denial to Det. Ricks that he had ever been in Plaquemines Parish. His blood was found in Plaquemines Parish, in the building from which one or more persons had stolen copper wiring on or between February 4, 2011 and February 7, 2011. The jury could infer from such a lie a consciousness of guilt on the part of defendant. See State v. King, 41,084, p. 6 (La. App. 2 Cir. 6/30/06), 935 So.2d 815, 821 (“[Ejvidence of defendant’s guilt can be inferred from his statement at the emergency room on the night of the murder, when defendant lied about the circumstances of his knife wound and said nothing about stabbing the victim in self-defense”).
Also, the only evidence the State presented indicating that, prior to the PPG’s acquisition of the state school complex on March 10, 2010, any part of it was being used in whole or in part as a place of business was evidence on a conveyance record that the property was the former Belle Chasse State School, and the testimony of PPG Director of Operations Scott Lott that after the PPG acquired the property two State employees who had been working at the state school complex at the time the PPG acquired it — including one who had been there for twenty years— continued to work at the complex for six months to a year after the sale.
Further, there was no evidence presented at all as to the issue of whether defendant might have had authority to enter the building at some point prior to the 11flPPG’s acquisition of it. Thus, even assuming for the sake of argument that proof of an entry by defendant on a date prior to the PPG’s acquisition of the property/building would suffice to sustain defendant’s conviction, the evidence would be insufficient as to whether that entry was unauthorized and as to whether any entry into that building during the State’s ownership would have been made at a time when it was being used in whole or in part as a place of business.
The blood evidence (and the Bic cigarette lighter found on the grass outside the other building burglarized), and the DNA profiles derived from that evidence matching defendant’s DNA profile, are the only direct evidence that defendant was ever in the building or on the state school complex grounds.
James Madere, who was using the building in which defendant’s blood was discovered on February 9, 2011, did not testify that prior to the break-in there was no blood on the floor of the building where the records were stored. Mr. Madere never testified at all concerning the blood evidence or that he had even observed it. Nor did Mr. Madere testify, for example, as to the last time the floors of the building in question had been cleaned, or as to *450 any regular cleaning schedule where, for example, a PPG employee or a private janitorial service would clean the floors inside of the building. As previously noted, however, the crime scene photographs of the blood evidence do show that the light-colored, speckle-patterned, linoleum tile floor appeared to be relatively clean, although there are some scuff marks and some dirt visible.
The State did not present any expert evidence, such as through the testimony of forensic DNA analysis expert Dr. Son, as to how long the blood evidence might have been on the floor. None of the police officers, notably Det. Ricks, who laiphotographed the blood evidence, testified, for example, that the blood drops/ spots appeared to be fresh.
As to the issue of defendant’s authority to enter the building, Det. Durnin testified that in the course of his investigation he did not find any indication that defendant had authority to be at the state school, or that defendant was employed by the PPG, or for a contractor for the PPG. Similarly, in the course of Det. Ricks’ investigation he contacted the human resources department of the PPG, and no one could ascertain that defendant worked for the parish. He did not find any information that defendant worked for a contractor for the PPG or that he had permission to be in the state school complex or the building where defendant’s blood was found. Also, PPG Director of Operations Scott Lott testified that he did not recognize defendant and had never given defendant permission to enter the building.
However, all of this testimony concerning defendant not having permission to enter the state school complex or the particular building in which his blood was found only pertains to the period after March 10, 2010, when the PPG obtained ownership of the complex.
The due process standard of review under Jackson v. Virginia does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt. State v. Higgins, 03-1980, pp. 17-18 (La.4/1/05), 898 So.2d 1219, 1232, citing State v. Lubrano, 563 So.2d 847, 850 (La.1990).
Considering the scant evidence from which it might be inferred how long defendant’s blood might have been in that building; the lack of evidence as to how long the PPG had been using the building in question in whole or in part as a place of business; and the lack of evidence as to whether defendant might have been an 12i authorized visitor in that building at some point during the State’s ownership of it; and viewing all the evidence (including that the blood evidence was discovered during the investigation of the February 4-7, 2011 break-in, and defendant’s denial to Det. Ricks that he had ever been in Plaquemines Parish) in a light most favorable to the prosecution, it does not appear that any rational trier of fact could have found beyond a reasonable doubt that defendant made an unauthorized entry into the building at issue in February 2011 when it was being used in whole or in part as a place of business.
For the foregoing reasons, we hereby reverse the defendant’s conviction and sentence.
CONVICTION AND SENTENCE REVERSED.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).