# Supreme Court of Louisiana

The Opinions handed down on the **17th day of March, 2015**, are as follows:

**PER CURIAM**:

2014-K -0432    STATE OF LOUISIANA v. WAYNE G. TAYLOR A/K/A WAYNE TAYLOR (Parish of Plaquemines)(Unauthorized Entry of a Place of Business))

The decision of the Fourth Circuit is therefore reversed, defendant's conviction and sentence are reinstated, and this case is remanded to the court of appeal to address the remaining assignments of error pretermitted on original appeal.
DECISION OF COURT OF APPEAL REVERSED; CONVICTION AND SENTENCE REINSTATED; CASE REMANDED.

SUPREME COURT OF LOUISIANA

NO. 2014-K-0432

STATE OF LOUISIANA

VERSUS

WAYNE G. TAYLOR A/K/A WAYNE TAYLOR

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF PLAQUEMINES

PER CURIAM:

Defendant was charged with two counts of simple burglary in violation of La.R.S. 14:62. After trial before a six-person jury in August 2012, he was found guilty of unauthorized entry of a place of business on count one and not guilty on count two. The trial court sentenced him to six years at hard labor. On appeal, the Fourth Circuit pretermitted other assignments of error and reversed defendant's conviction and sentence on grounds of insufficient evidence. State v. Taylor, 13-0265 (La. App. 4 Cir. 12/18/13), 130 So.3d 439. We granted the state's application to review the decision below and reverse for the reasons that follow.

On March 10, 2010, the Plaquemines Parish Government (PPG) acquired ownership of the state school located at 251 F. Edward Hebert Blvd. in Plaquemines Parish from the Department of Health and Hospitals. The location is a sprawling 341-acre site comprised of several building complexes located close to the line separating Orleans from Plaquemines on the west bank of the Mississippi just across the Intracoastal Waterway and not far from English Turn in Orleans Parish. In January 2011, contractors working at the site reported that the power was off and that copper wire had been removed from one or more of the buildings over the weekend. Detective Paul Durnin responded to the report and determined that

the copper wire to three buildings grouped together in one of the complexes on the grounds had been pulled out "from the breakers, all the way through the walls and through the ceiling." It appeared that a vehicle had been used to pull the wire out of the three buildings. "I guess it's too much to pull by hand," the detective testified, "so, actually, [they] hooked up a car to it, and they would run the car maybe 50 or 60 feet and they would pull all the wire out of the building. Go back; do it again." A cigarette lighter was found at the scene near the location of the break-in, along with a pole normally used to shut off electricity by pulling the breakers and isolating the system from the utility grid. In the opinion of Lieutenant Tom Morovich who found the lighter, the evidence appeared to have been a "fresh drop," as the lighter was lying on top of some grass and did not appear to have any rust on it. The police sent the lighter to the Louisiana State Police Laboratory and enough testable DNA was found to develop a profile then uploaded into CODIS [Combined DNA Index System]. The profile matched defendant's DNA profile in CODIS entered after his conviction in 2008 for unauthorized entry of a business.

Less than a month later, a second incident also involving the massive loss of electrical copper wiring occurred at the site in one of the five buildings comprising the Beech Grove complex at the back of the sprawling grounds and farthest away from the entrance on F. Edward Hebert Blvd. Lieutenant Brett Ricks investigated this incident and took a series of photographs documenting the damage to one of the buildings in the complex. One side wall "was almost pulled . . . completely down." The door on that side had been forced inward leaving it barely hanging on its hinges. At a nearby outside transformer, three electrical lines combined in a pipe running underneath the complex had been severed at the box. Inside, at the breaker box controlling the electrical feed to all of the buildings in the Beech Grove complex, the wires had been severed and also stripped out. Holes also had been punched in the ceiling to access conduit pipes that were then cut to pull out

2

electrical wiring. Left behind was some sort of remote vehicle key pad access device. Also left behind were spots of blood on the otherwise clean linoleum floor inside the building and samples were taken. The DNA found in the sample was matched to defendant's DNA profile in CODIS and a warrant for his arrest issued on the basis of the two preliminary DNA matches. Although he did not photograph any tire tracks on the scene, Ricks thought it likely a vehicle had been used to help strip out the wire in the February 2011 break-in as in the earlier January incident.

Defendant was not arrested for several months, however, and in the interim Detective Durnin did not find any indication that defendant had the authority to be at the scene, that he had been employed by PPG, or that he worked for a contractor for PPG. For that matter, the detective also failed to find any of the missing copper wire. Detective Durnin was present when defendant was taken into custody, advised of his rights, and booked on two counts of simple burglary. Defendant refused to give a statement but indicated he would answer one question. When asked by Lieutenant Ricks if he had ever been in Plaquemines Parish before, defendant replied that he had not. Defendant further explained: "The only time that I've been on the west bank would have been Manhattan Boulevard."

Buccal samples were taken from defendant following his arrest and the DNA profile developed from the swabs confirmed the preliminary CODIS match to defendant's profile developed from the evidence collected after the January and February 2011 incidents. According to Dr. Leslie Son, a forensic DNA analyst for the Louisiana State Police Crime Laboratory, the probability of finding the same DNA profile in the blood samples taken after the February 2011 incident from an unrelated random individual other than defendant was "1 in 11.2 quadrillion." As for the DNA on the cigarette lighter, Erica Sparacino, another DNA analyst at the state police crime lab, testified that the sample revealed the DNA of at least two individuals and defendant could not be excluded as one of the donors. According

3

to Sparacino, defendant's profile "was present" and "the numerical value for this case was that it is three times more likely to be a profile from Wayne Taylor and a random individual than two unknown unrelated individuals." The state's case on both counts turned on this DNA evidence as it had no other evidence, direct or circumstantial, placing defendant on the scene of either incident.

Defendant did not testify at trial and initially defense counsel sought to establish on cross-examination of Detective Durnin that the complex at 251 F. Edward Hebert Boulevard is located so close to the parish line that anyone might step unwittingly across the line without realizing that he had left Orleans and entered Plaquemines Parish. Counsel thereby sought to minimize the significance of defendant's statement at booking that he had never been in Plaquemines Parish. But the defense that emerged ultimately drew on evidence provided by Scott Lott, Director of Operations at the complex. Lott conceded that security at the site, which was not fenced off but was posted with "No trespass signs" across the front, could not keep pace with "[p]eople trespassing, people hunting, people breaking in. . . . Burglarizing, cutting wire." R., Vol. 2, p. 439. In one such instance, only days after the February 2011 break-in, a black male in a truck who claimed to be going fishing fled from the property when challenged. In another incident, three occupants of a vehicle with temporary tags eventually traced back to defendant's landlord were chased off the property in April 2011. Further, the state had offered nothing more than Detective Durnin's opinion that PPG had sustained $200,000 in lost copper wiring which, as far as the police could determine, had never surfaced at any local dealer. No wire was recovered from defendant when he was arrested, no prints from defendant were found on the scene, and counsel suggested that Dr. Son, the state's DNA expert, was not that competent after all (although he had stipulated to her qualifications) because she did not know the total number of alleles in the human body. Against this background of undocumented large losses

4

to the parish, a history of lax security at the facility, and DNA evidence open to question, counsel sought to distance defendant from Plaquemines Parish as much as possible by taking him at his word:

> We also heard that there was a lot of monkey business going on over there. . . vandalism, looting . . . a lot of monkey business going on.

> Wayne is – we have a lot of great things about our parish, and we need to cherish that. One thing about our parish, though, it's very insular. Wayne is the perfect fall guy for this. If there was a lot of monkey business, as the evidence proved, going on over there, Wayne is not from the parish, he has no connections, no ties, and no clout. So, he's as good a guy as anybody to pin this on.

In reversing defendant's conviction and sentence, the court of appeal noted at the outset that defendant challenged the sufficiency of the evidence on a wrong premise when he argued on appeal that the drops of blood found on the scene following the February 2011 break-in were <u>outside</u> the building. In fact, the state's photographic evidence clearly depicted the drops of blood on an otherwise relatively clean, white linoleum floor <u>inside</u> the building from which the wire had been completely stripped out. Thus, the court of appeal acknowledged that the state's evidence proved that defendant had been inside the building at some time on at least one occasion and that his statement to the police at booking that he had never before been in the parish could be taken as a lie from which a rational trier of fact could infer a consciousness of guilt. <u>Taylor</u>, 13-0265 at 18, 130 So.3d at 449. Further, various witnesses testified that to their knowledge, defendant had never been an authorized visitor to the complex after PPG had taken it over, or that he had ever been employed by one of the contractors working on the scene.

That said, the court of appeal noted that "all of this testimony concerning defendant not having permission to enter the state school complex or the particular

5

building in which his blood was found only pertains to the period after March 10, 2010, when the PPG obtained ownership of the complex." Taylor, 13-0265 at 20, 130 So.3d at 450. The Fourth Circuit further observed that the state presented the jury with no evidence of how long defendant's blood might have been on the floor. Notably, none of the police officers involved in the investigation, especially Lieutenant Ricks who actually photographed the blood evidence, testified that the blood drops appeared fresh. In addition, while the photographs taken by Ricks showed a "relatively clean" linoleum floor marked by only a few scuff marks and some visible dirt, the state failed to present any evidence as to the last time the floors in the building had been cleaned, "or as to any regular cleaning schedule where, for example, a PPG employee or a private janitorial service would clean the floors inside of the building." Id. 13-0265 at 19, 130 So.3d at 449-50. The court of appeal observed:

> The due process standard of review under Jackson v. Virginia [443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)] does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt. State v. Higgins, 03-1980, pp. 17-18 (La. 4/1/05), 898 So.2d 1219, 1232, citing State v. Lubrano, 563 So.2d 847, 850 (La. 1999).
>
> Considering the scant evidence from which it might be inferred how long defendant's blood might have been in that building; the lack of evidence as to how long the PPG had been using the building in question in whole or in part as a place of business; and the lack of evidence as to whether defendant might have been an authorized visitor in that building at some point during the State's ownership of it; and viewing all the evidence (including that the blood evidence was discovered during the investigation of the February 4-7, 2011 break-in and defendant's denial to Det. Ricks that he had ever been in Plaquemines Parish) in a light most favorable to the prosecution, it does not appear that any rational trier of fact could have found beyond a reasonable doubt that defendant made an unauthorized entry into the building at issue in February 2011 when it was being used in whole or in part as a place of business.
>
> Taylor, 13-0265, pp. 20-21, 130 So.3d at 450.

6

The majority thus reversed defendant's conviction and sentence, pretermitting several other assignments of error, including that the police secured his statement that he had never been in Plaquemine Parish after he asserted his right to remain silent and thereby rendered the statement inadmissible at trial, and that the trial court erred in permitting the state to introduce documentary evidence of defendant's prior conviction in 2008 for unauthorized entry of a place of business, although the DNA reports from the Louisiana State Police Crime Laboratory, also introduced into evidence, reflected that conviction as the qualifying offense that led to the uploading of defendant's DNA profile into CODIS.

The court of appeal erred, however, in substituting for the jury's appreciation of the evidence a hypothesis of innocence so remote and conjectural that it would not cause a rational trier of fact necessarily to have a reasonable doubt of defendant's guilt. The rational trier of fact standard established by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), preserves "'the factfinder's role as weigher of the evidence,'" by requiring an appellate court to review "'all of the evidence . . . in the light most favorable to the prosecution.'" McDaniel v. Brown, 558 U.S. ____, ____, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting Jackson, 443 U.S. at 319, 99 S.Ct. at 2781). Preserving the role of the factfinder means that in cases involving circumstantial evidence, when "the jury reasonably rejects the hypothesis of innocence presented by the defendant[], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." State v. Captville, 448 So.2d 676, 680 (La. 1984). The alternative hypothesis is not one that merely "could explain the events in an exculpatory fashion," but one that, after viewing all of the evidence in a light most favorable to the prosecution, admissible as well as inadmissible, "is sufficiently reasonable that a rational juror could not 'have found proof of guilt

7

beyond a reasonable doubt.'" Captville, 448 So.2d at 680 (quoting Jackson); see State v. Hearold, 603 So.2d 731, 734 (La. 1992) ("[W]hen the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial."). Preserving the role of the factfinder by an appellate court also means that a defendant may not "split[] alternative and inconsistent defenses in different forums, raising one defense before the jury and when that fails, a second defense presupposing a different set of facts in an appellate court conducting sufficiency review under Jackson and La.C.Cr.P. art 821(E)." State v. Juluke, 98-0341, pp. 4-5 (La. 1/8/99), 725 So.2d 1291, 1293.

In the present case, the Fourth Circuit found a reasonable hypothesis of innocence not advanced by the defendant at any level. But whatever their origins, the hypotheses of innocence posed in the present case as a reason for vacating defendant's conviction and sentence are equally unavailing. Jurors reasonably rejected the hypothesis of innocence actually offered at trial. Viewing all of the evidence in a light most favorable to the prosecution, the state's forensic DNA evidence with respect to not only the drops of blood found at the scene of the February 2011 burglary but also on the scene of the earlier January incident in the "fresh drop" of the cigarette lighter, gave jurors a rational basis for rejecting counsel's scapegoat hypothesis premised on the supposed insularity of Plaquemines Parish and the governing authority's willingness to blame its substantial monetary losses in stolen copper wiring on a person who claimed to have absolutely no connection to the parish. With respect to Ms. Son, rational jurors could find credible her explanation that she could not give a final count of the number of alleles in the human genome because, "To be honest . . . there are too many [alleles] to count . . . . we have about 25,000 genes; and if each of those

8

genes ha[s] two alleles, I would say about 50,000." The DNA evidence established that defendant had been on the premises at 251 F. Edward Hebert Boulevard and the "fresh drop" of the lighter established his presence contemporaneously with the January 2011 incident. The similarity of the two incidents, each involving the massive stripping out of copper wiring from the facilities with the aid of a vehicle to help pull the wire out of the building, gave jurors a rational basis for concluding, even in the absence of any evidence regarding maintenance at the facility and the frequency with which floors were cleaned, that the deposit of defendant's DNA in the blood drops found on the floor of one of the buildings in the Beech Grove complex was also contemporaneous with the February 2011 break-in. It was also entirely consistent with the level of damage inside the building and the scrapes and cuts that might occur during the heavy work entailed in the severing of the electrical wiring to the breaker boxes and the punching of holes in the ceiling to access the conduit pipes then to strip out the wire.

Rational jurors could further hold against defendant the full weight of finding that he had lied, not simply inadvertently misstated the case, when he claimed at booking he had never been in Plaquemines Parish or, more generally, on the west bank of the Mississippi except for Manhattan Boulevard. Jurors could reasonably find that even if someone unfamiliar with the parish might confuse whether he was standing in Orleans or Plaquemines when he was within that bend of the Mississippi River and so close to the parish line running behind the building complexes and grounds at 251 F. Edward Hebert Boulevard, he would not likely confuse which bank he was standing on when travelling from one bank of the river to the other. And Plaquemines Parish jurors were presumably well aware that Manhattan Boulevard, in Gretna, across the parish line in Jefferson Parish, was some miles away from F. Edward Hebert Boulevard. The prosecutor appealed to local knowledge when he noted during closing argument that, "[N]o one is

9

confusing F. Edward Hebert with Manhattan Boulevard." As the court of appeal acknowledged, rational jurors could find from the lie a consciousness of guilt. Captville, 448 So.2d at 680, n.4 ("Such a finding of purposeful misrepresentation reasonably raises the inference of a 'guilty mind', just as in the case of 'flight' following an offense or the case of a material representation of facts by a defendant following an offense. 'Lying' has been recognized as indicative of an awareness of wrongdoing.") (citation omitted).

On appeal, the defense suggested an alternate hypothesis that the theft of the copper wire pulled out of the building in February 2011 did not involve an entry into the building, as the electric lines were cut at the transformer and then ripped out of the building by means of a vehicle pulling the wire through the walls. In fact, jurors appear to have subscribed to that hypothesis in acquitting defendant of the earlier January incident because no evidence placed anyone inside the building, as opposed to outside, where the lighter was found along with tire tracks left by a vehicle evidently employed to pull the wire out of the building. Notably, the scene was not documented in a series of photographs in the same way Lieutenant Ricks memorialized the crime scene left after the February incident. As applied to the February 2011 break-in, however, appellate counsel's hypothesis required a finding that the drops of blood were discovered outside of the building just like the lighter in the offense less than a month earlier. But the court of appeal correctly noted that photographs of the scene clearly depicted the blood smears on the interior linoleum floor of the building. The photographs also depicted a door that had been nearly pulled off of its hinges, the likely point of entry into the building, as well as the interior breaker box controlling the electrical flow to all of the buildings in the Beech Grove complex, its electrical lines severed, the remote access key pad device evidently left behind, and the holes punched in the ceiling to access even more electrical wiring. The evidence overwhelmingly proved that an

10

unauthorized entry occurred. As the prosecutor emphasized in closing, without rejoinder by the defense: "In the second incident it's the blood on the interior of that building, not outside. It's on the interior of that building where the damage is . . . where that copper wire was stripped."

A third hypothesis of innocence, adopted by the court of appeal of its own accord, takes the state to task for "the lack of evidence as to whether defendant might have been an authorized visit in that building at some point during the State's ownership of it." Taylor, 13-0265 at 20, 130 So.3d at 450. In the view of the appellate court, the state's demonstration that defendant's statement at booking was a lie gave rise to the possibility of innocent as well as guilty presence at the facility. But this hypothesis is not only diametrically opposed to the defense actually offered at trial, it is also at odds with the court of appeal's finding that rational jurors could draw from the lie an inference of a guilty mind. And given that rational inference, reasonable jurors would not <u>necessarily</u> entertain a reasonable doubt with respect to when and how defendant deposited his blood on the floor in the Beech Grove complex. As opposed to the wholly conjectural and highly unlikely hypothesis of innocence advanced by the Fourth Circuit, which would ask jurors (but did not ask the factfinders in defendant's case) to entertain the possibility that defendant had paid an authorized visit to the premises when it was still a state school, during which he somehow managed to cut himself to leave behind blood on the floor which remained untouched for well over a year in good enough condition to yield testable biological evidence, and then lied about it, the state's theory of the case was consistent overall with all of the evidence at trial and offered a much more immediate explanation for how and when defendant's blood came to be on the floor of that Beech Grove building. At the close of the case, the prosecutor asked jurors not to speculate about untested theories without any basis in the evidence presented at trial but to consider that "we can't take each piece in

11

isolation. We can't just say Detective Durnin only knew about the light, Detective Ricks only knew about the blood. You-all are the ones that can see the whole puzzle."

Nevertheless, as noted by the Fourth Circuit, the state did not present a particularly compelling case that the building accessed in the February 2011 incident was used as a place of business. James Madre, a 20-year employee of PPG, testified that he had control of one of the buildings depicted in the photographs taken by Lieutenant Ricks and that it was used for storage of archival files and records. Even granting that a state unemployment office, State v. Coleman, 528 So.2d 192, 195 (La. App. 3 Cir. 1988), and a church, State v. Smith, 28,516, p. 2 (La. App. 2 Cir. 8/21/96), 679 So.2d 491, 492, have qualified as a business for purposes of R.S. 14:62.4, an archival storage unit would not appear to fall within the scope of the statute. In Coleman, however, the Third Circuit adverted to a definition of "business" as "'[t]hat which habitually busies or occupies or engages the time, attention, labor and efforts of persons as a principal serious concern or interest or for livelihood or profit.'" Coleman, 528 So.2d at 195 (quoting Black's Law Dictionary, 179 (5th ed. 1979)). That definition appears broad enough to encompass a local governing body needing storage space for it records as it conducts the business of the parish.

In any event, unauthorized entry of a place of business is a statutorily-provided responsive verdict to a charge of simple burglary, La.C.Cr.P. art. 814(A)(42) and the evidence presented at trial was sufficient to have supported a verdict for the charged offense of simple burglary. The evidence was therefore sufficient to support a verdict for the lesser offense and statutory responsive verdict as to which the defense had no objection. See State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La. 1982) ("[A]t least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the

12

conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support he offense changed.").

The decision of the Fourth Circuit is therefore reversed, defendant's conviction and sentence are reinstated, and this case is remanded to the court of appeal to address the remaining assignments of error pretermitted on original appeal.

**DECISION OF COURT OF APPEAL REVERSED; CONVICTION AND SENTENCE REINSTATED; CASE REMANDED**