# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# NO. 2021 KA 0630

## STATE OF LOUISIANA

## VERSUS

## CLEAO DUNN, JR.

Judgment Rendered: **DEC 2 2 2021**

* * * * *

On Appeal from the
20th Judicial District Court
Parish of East Feliciana, State of Louisiana
No. 18-CR-403

The Honorable Kathryn E. Jones, Judge Presiding

* * * * *

Samuel C. D'Aquilla                          Attorneys for the State of Louisiana
District Attorney
Jessica B. Weimer
Assistant District Attorney
Clinton, Louisiana


James P. Manasseh                            Attorneys for Defendant/Appellant,
J. Andrew Bevinetto                          Cleao Dunn, Jr.
Yigal Bander
Baton Rouge, Louisiana

* * * * *

BEFORE: LANIER, WOLFE, AND BURRIS,[1] JJ.

---

[1]    The Honorable William J. Burris, retired, is serving *pro tempore* by special appointment of the Louisiana Supreme Court.

**WOLFE, J.,**

The defendant, Cleao Dunn, Jr., was charged by amended grand jury indictment with one count of second degree murder (count I), a violation of La. R.S. 14:30.1; and two counts of attempted second degree murder (counts II and III), violations of La. R.S. 14:27 and 14:30.1. He pled not guilty on all counts. Following a jury trial, on count I, he was found guilty of the responsive verdict of manslaughter, a violation of La. R.S. 14:31, by a non-unanimous verdict, and on counts II and III, he was found guilty of the responsive verdicts of aggravated assault with a firearm, a violation of La. R.S. 37.4, by unanimous verdicts. He moved for a new trial, and the motion was granted on count I. See **Ramos v. Louisiana,** __ U.S. __, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). He moved for a post-verdict judgment of acquittal, but the motion was denied. On counts II and III, on each count, he was sentenced to consecutive sentences of five years imprisonment at hard labor, with all but two years suspended. Additionally, on counts II and III, the court imposed a concurrent period, upon release, of five years probation and a $2,000 fine. The defendant now appeals, challenging the sufficiency of the evidence. For the following reasons, we affirm the convictions and sentences.

### FACTS

On April 4, 2018, John Davis was fatally shot in his vehicle in a rural area near Clinton, Louisiana. Kayla George, the victim of count III, was his girlfriend. George had previously been in a relationship with the defendant between December 2015 and April 2017. The defendant drove a black Chevrolet Tahoe. According to George, Davis and the defendant "always had prior problems."

George testified she and Eric Coates were with Davis in his vehicle when the incident occurred. They were on their way back home after buying cigarettes at T-Man's, a store on Highway 10, in East Feliciana Parish. George saw the defendant's Tahoe before they reached the stop sign at the end of Robins Road. The defendant was

2

following "fairly close," i.e., one to three feet, behind Davis' vehicle. Davis asked George to "see who it was." George looked back and saw the defendant smiling.

After Davis stopped at the stop sign, he opened his driver's side door, leaned his head and upper body out of the vehicle, and asked the defendant "What's up? Why you following behind us?" Davis did not exit the vehicle. George did not hear the defendant's response. Davis closed his door, stated, "F--- that n----r. He don't wanna fight," and began turning off Robins Road onto Highway 961. George then heard gunfire. She looked back and saw the defendant in the road with an assault rifle in his hand. She indicated the defendant was wearing a black shirt, blue jeans, and a hat. According to George, as Davis drove off, he returned fire with his .45 caliber handgun, firing back at the defendant approximately four times. Davis then began screaming, stating he "was shot." He held his back, and George saw that his seat was "full of blood." He then stopped talking, stopped moving, and "his eyes [began] rolling." Thereafter, Davis lost control and wrecked his car. George did not see the defendant's vehicle after the wreck.

On cross-examination, George conceded she had lied to the police in her previous account of the incident. She admitted she had stated that Davis never had a gun. She also admitted she had described Davis as a "hot-head," and stated that he "would do what he wants." She denied Davis blocked the road with his car and waited for the defendant. She further denied Davis fired on the defendant first. When asked at trial to confirm that Davis shot at the defendant, hitting the windshield two to three times, she answered, "Incorrect." When defense counsel asked George whether she could explain why the defendant shot out his windshield, she replied, "I can say that I never saw him do it. So if that was done, it was done after the altercation."

Eric Coates, the victim of count II, testified at trial. Davis was his good friend and like a brother to him. He was with Davis and George in Davis' red Toyota Camry on the day of the incident. After they left T-Man's at approximately 1:00 p.m., Coates

3

noticed a vehicle closely following, only six to seven feet behind them. Coates asked Davis, "what is this like on our bumper like this?" George looked back and stated it was the defendant. When Davis, George, and Coates got to the end of the road, Davis opened his door and asked the defendant, "Why are you on our bumper like that? Like, what's your problem?" The defendant exited his vehicle with an assault rifle. He pointed the weapon towards Davis. According to Coates, the defendant stated, "Go on ahead. I ain't, you know, I ain't for all that today." Coates told Davis to "just go, like [because] he behind us, he can do anything with us." Davis did not exit the Camry. He closed his door, rolled down the window, and drove off.

According to Coates, after Davis turned onto Highway 961, the defendant began firing the assault weapon. Coates did not see where the defendant was standing when he opened fire because Coates was "ducking." Coates heard multiple shots, and the last shot "came through and hit [Davis]." Coates testified he did not see Davis with a gun. He did not recall anyone firing at the defendant from the Camry.

On cross-examination, Coates conceded he had been charged with obstruction of justice. He admitted the police believed he had removed and disposed of a weapon in Davis' possession during the incident. When asked if he remembered telling the police that Davis asked the defendant "What? You wanna fight or something?[,]" Coates answered "Correct." When asked if he was denying that Davis had a weapon on the day of the incident, he answered, "Not of my knowledge." Coates denied that he asked Davis or George to give him the gun. Coates also denied that Davis begged for the gun because he needed to defend himself. When asked if he knew "one hundred percent, without any question, that [Davis] didn't fire a weapon[,]" Coates answered, "Correct. Like, I ain't gonna say a hundred percent. 'Cause at the time I'm getting shot at. Like I say, I'm scared for my life. I'm ducking. So, I'm not really paying attention if he had a gun or not."

Louisiana State Police Crime Laboratory Crime Scene Unit Supervisor Michele Smith testified she was certified as a senior crime scene analyst by the International Association for Identification. The trial court accepted her as an expert in crime scene investigation.

Smith investigated the incident. At the intersection of Highway 961 and Robins Road, Smith recovered thirteen 5.56 millimeter NATO cartridge cases. Smith also examined Davis' Toyota Camry and the defendant's Chevrolet Tahoe.

The Camry contained three cartridge cases and a box of .45 caliber ammunition in the glove box.[2] The fatal shot, which Smith referenced as shot "A," passed through the Camry's trunk, backseat, back of the driver's seat, and exited out of the front of the driver's seat and into Davis's back. Smith also found a suspected bullet hole in a piece of the Camry's rear windshield. However, too much of the glass was missing and there was too much damage to the rear windshield for her to determine if the hole was actually a bullet hole and, if so, whether the hole had been made by a bullet entering or exiting the Camry.

Smith testified shot "B" entered the Tahoe through the front windshield and damaged its rearview mirror before coming to rest in the back of the vehicle. She referenced shot "C" as a fragment that hit, but did not pass through, the windshield of the Tahoe after a bullet hit the hood of the vehicle. Additionally, Smith indicated three shots, which she referenced as shots "D," "E," and "F," had come from inside the Tahoe, near the driver's seat, and exited the vehicle through the front windshield.

Smith explained that the process of sequencing shots in glass was based on an examination of radial fractures to the glass caused by different shots. Smith indicated shot "C" was not close enough to shots "B," "D," "E," or "F" to determine the complete

---

[2] Smith was shown a photograph that she identified as showing the contents of the Camry's trunk, which included an empty box of ammunition.

5

shot sequence in the instant case. Smith was able to determine that shot "B," came before Shot "F."

When asked by defense counsel if it was possible that shot "B" came into the Tahoe before shots "D," E"," and "F" left the Tahoe, Smith replied, "Yes, Sir. We don't have any evidence to dispute that. Yes, Sir." Subsequently, defense counsel asked why Smith's report did not indicate that a shot coming into the Tahoe happened before a shot going out of the Tahoe. Smith answered:

> The reason I did not put that in my report is because the shot off to the side could not be correlated to the other four shots. Therefore, that shot off to the side could have happened either before, during, or after those four shots. So that information, uh, would be misleading in the report if I put that in there.

On redirect examination, Smith indicated, based on the height of the vehicles, their positions at the intersection, and the terrain, it was impossible for the shot that killed Davis to have been fired from inside the Tahoe. Smith also answered affirmatively when asked whether it was possible that within the three to four hours after the shooting occurred, "[the defendant] could have got his story straight, [the defendant] could have made up a story, [the defendant] could have said it's self defense, and [the defendant] could have shot his own window out at a different location[.]"

Roy Goodman testified at trial. On the day of the incident, he was painting a residence on Highway 961. Goodman heard "a bunch of shooting and then heard a sound like a bad crash." Goodman stated he had hunted all his life, and the gunfire "sounded like several guns." He testified "first one I heard sounded like a pistol and then [sic] second one it sounded like some type of rifle."

After the gunfire, Goodman saw a Camry speed by followed by a black SUV. The vehicles were driving away from the gunfire. The SUV was "[j]ust a few seconds" behind the Camry. Goodman assumed the SUV was chasing the Camry because the

SUV was "going extremely fast." He stated the SUV was traveling "as fast as they could probably travel that road."

Goodman testified "a couple of minutes" after the crash, the SUV came back up the road and pulled into the driveway of the house he was painting. The SUV "just, more or less sat out there." Goodman stopped painting and went into the house because he was afraid he might get shot.

In a statement recorded by police at 7:29 p.m. on April 4, 2018, the defendant claimed he had "somehow ended up behind" Davis' red Camry on "Robbin Road." The defendant stated there were other people in the Camry with Davis, but when asked if he knew them, he replied, "Not really, sir, I don't really know." The defendant denied having a "beef" with Davis or that they had been arguing over "that girl," and said he did not know if Davis was mad at him "about a female." According to the defendant, Davis "blocked … the road off," exited his vehicle, stated, "What's up with all that capping," and started shooting at him. The defendant claimed he ducked down in his vehicle, then "raised back up" with his "AR-15," and shot three shots through the windshield of his vehicle. He claimed he never left his vehicle and only fired from inside his vehicle. He claimed he acted in self-defense.

## SUFFICIENCY OF THE EVIDENCE

In his sole assignment of error, the defendant contends the evidence was insufficient to prove guilt beyond a reasonable doubt to a rational trier of fact. He argues the physical evidence was insufficient to prove beyond a reasonable doubt that he fired first and, in fact, tended to prove that Davis fired first. He also argues the testimony of Goodman was insufficient to prove beyond a reasonable doubt that the defendant fired first and, in fact, tended to prove that Davis fired first. Additionally, he argues his version of the incident was consistent with the physical evidence, while the testimony of George and Coates was internally contradictory and in irreconcilable conflict with the physical evidence. Lastly, the defendant argues no rational trier of

7

fact could have found that the State proved beyond a reasonable doubt that he did not act in self-defense.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, as enunciated in **Jackson v. Virginia**, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove, in order to convict," every reasonable hypothesis of innocence is excluded. La. R.S. 15:438; **State v. Gilley**, 2019-1543 (La. App. 1st Cir. 7/17/20), 308 So.3d 1194, 1199-1200, writ denied, 2020-01067 (La. 12/22/20), 307 So.3d 1026.

In **State ex rel. Elaire v. Blackburn**, 424 So.2d 246, 251 (La. 1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), the Louisiana Supreme Court recognized the legitimacy of a "compromise verdict," i.e., a legislatively approved responsive verdict that does not fit the evidence, but that (for whatever reason) the jurors deem to be fair, as long as the evidence is sufficient to sustain a conviction for the charged offense. If the defendant timely objects to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict, the court overrules the objection, and the jury then returns a verdict of guilty of the responsive offense, the reviewing court must examine the record to determine if the responsive verdict is supported by the evidence and may reverse the conviction if the evidence does not support the verdict. **Elaire**, 424 So.2d at 251. However, if the defendant does not enter an objection (at a time when the trial judge can correct the

8

error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury. **Id**. In this case, there was no objection to the instruction on the responsive verdict of aggravated assault with a firearm. The jury's ultimate reasoning for returning this responsive verdicts is unclear, but it is possible that these verdicts represented a "compromise." Regardless of the jury's ultimate reasoning, the evidence presented at trial was sufficient to convict the defendant of attempted second degree murder on counts II and III.

## ATTEMPTED SECOND DEGREE MURDER

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Further, a specific intent to kill is an essential element of the crime of attempted murder. **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 982.

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A). Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended. La. R.S. 14:27(B)(1). Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such

9

as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. **Currie**, 321 So.3d at 983. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **State v. Eason**, 2019-0614 (La. App. 1st Cir. 12/27/19), 293 So.3d 61, 70.

Any rational trier of fact, viewing the evidence in the light most favorable to the State, could find that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of attempted second degree murder and the defendant's identity as the perpetrator of those offenses against George and Coates. The verdicts returned in this matter indicate the jury accepted the testimony of the State witnesses while rejecting the defendant's attempts to discredit those witnesses.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. The fact that the record contains evidence that conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient. **State v. Nixon**, 2017-1582 (La. App. 1st Cir. 4/13/18), 250 So.3d 273, 291, writ denied, 2018-0770 (La. 11/14/18), 256 So.3d 290; **Gilley**, 308 So.3d at 1200-01.

## JUSTIFIABLE HOMICIDE

The defendant argues while the trial court charged the jury on La. R.S. 14:20, it failed to charge the jury "on the different and less onerous justification defense as

10

applicable to a non-homicide such as [a]ggravated [a]ssault with a [f]irearm (La. R.S. 14:19)." The defendant further argues this court should review the sufficiency of the evidence based on La. R.S. 14:19, rather than La. R.S. 14:20.

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). In a non-homicide case where justification is asserted, a dual inquiry is employed: an objective inquiry into whether the force was reasonable under the circumstances; and, a subjective inquiry into whether defendant believed that force was apparently necessary. See La. R.S. 14:19; **State v. Jones**, 2018-0479 (La. App. 1st Cir. 11/2/18), 2018 WL 5779773, *3.

Here, the trial court charged the jury, in pertinent part, as follows:

Self-defense. A homicide is justifiable if committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

Louisiana Code of Criminal Procedure article 801(C) provides, in pertinent part:

A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection.

The defendant failed to contemporaneously object to the charging of the jury with La. R.S. 14:20 or to the failure to charge the jury with La. R.S. 14:19. Further, while he requested special jury charges, he failed to request the jury be charged with La. R.S. 14:19. Accordingly, the defendant is precluded from raising the alleged jury charge error on appellate review. La. Code Crim. P. art. 801(C). The contemporaneous objection rule serves two laudable and related purposes. The first is succinctly stated in Professor Dale Bennett's original comments to La. Code Crim. P.

11

art. 841: to prevent the defendant from having "an anchor to windward" to urge for the first time in the event of conviction. In fairness to the State, the defendant cannot simply watch the proceedings unfold and silently hope that the State will introduce inadmissible evidence or that the trial court will commit error. Significantly, the rule also prevents the defendant from adopting, as a matter of trial strategy, one approach, and then, if that approach fails, arguing a contrary view on appeal. Furthermore, the defendant has a duty to alert the trial court, if he objects to the admissibility of evidence or the method of proceeding. This allows the trial court to correct (or avoid) error, so that the verdict results from a trial that is as error-free as possible. **State v. Johnson**, 98-1407 (La. App. 1st Cir. 4/1/99), 734 So.2d 800, 806, writ denied, 99-1386 (La. 10/1/99), 748 So.2d 439.[3]

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21; see **Gilley**, 308 So.3d at 1201.

When self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. The issue is whether a rational fact finder, viewing the evidence in the light

---

[3] Nevertheless, exceptions to this rule have been made in individual cases where there have been fundamentally erroneous misstatements of the essential elements of the charged offense. In such cases, the Louisiana Supreme Court has adopted the view that such fundamentally incorrect jury instructions so affect the fairness of the proceedings and the accuracy of the fact finding process that due process of law requires reversal, even in the absence of compliance with legislative procedural mandates. See **State v. Williamson**, 389 So.2d 1328, 1331 (La. 1980); **Johnson**, 734 So.2d at 807; contra **State v. Thomas**, 427 So.2d 428, 435 (La. 1982) (on rehearing) (limiting **Williamson** as it "should not be construed as authorizing appellate review of every alleged constitutional violation and erroneous jury instruction urged first on appeal without timely objection."). There is no allegation in this case that the jury charge contained fundamentally erroneous misstatements of the essential elements of the charged offenses.

12

most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant did not kill the victim in self-defense. **Gilley**, 308 So.3d at 1201. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. York**, 2013-1529 (La. App. 1st Cir. 3/24/14), 2014 WL 1203207, *3, writ denied, 2014-1047 (La. 4/17/15), 168 So.3d 392. No such hypothesis exists in the instant case.

The State's theory that the defendant was the aggressor was based on the testimony of George and Coates that the defendant aggressively tailgated the Camry in which they were riding before ultimately opening fire with an assault weapon on the vehicle. The defendant's theory that Davis was the aggressor relied upon the jury accepting the defendant's story that Davis blocked the defendant's path with the Camry and then fired upon him before the defendant returned fire.

In finding the defendant guilty, the jury rejected the defendant's claim of self-defense and concluded that the use of deadly force under the particular facts of this case was neither reasonable nor necessary. Contrary to the defendant's claim, the testimony of Smith does not establish the jury acted irrationally in convicting the defendant. Smith's testimony that one of multiple shots fired into the Tahoe may have been fired before one of multiple shots fired out of the Tahoe did not discredit George's testimony that the defendant fired on Davis before he returned fire. Further, Smith acknowledged that it was possible the defendant "got his story straight" in the hours after the shooting, making up a self-defense claim and firing shots out of the Tahoe at a different location. Crediting the testimony of an eyewitness over expert testimony is a matter within the purview of the jury. Nor does the testimony of Goodman establish that the jury acted irrationally in convicting the defendant. The verdicts returned in this matter indicate the jury accepted George's account of the incident while rejecting Goodman's testimony that he heard pistol fire before rifle fire. Crediting the testimony

13

of an eyewitness over another witness' testimony is also a matter within the purview of the jury. Moreover, the defendant's act of leaving the scene of the incident and failing to report it are inconsistent with a theory of self-defense. Flight following an offense reasonably raises the inference of a "guilty mind." See **State v. Taylor**, 2014-0432 (La. 3/17/15), 166 So.3d 988, 995 (*per curiam*); **State v. Rosario-Colon**, 2019-0406 (La. App. 1st Cir. 9/27/19), 289 So.3d 126, 135, writ denied, 2019-01806 (La. 1/28/20), 291 So.3d 1055, cert. denied, ___ U.S. ___, 140 S.Ct. 2727, 206 L.Ed.2d 859 (2020). A rational juror could have reasonably concluded that the killing was not necessary to save the defendant from the danger envisioned by La. R.S. 14:20(1) and/or that the defendant had abandoned the role of defender and taken on the role of an aggressor and, as such, was not entitled to claim self-defense. See La. R.S. 14:21; **Gilley**, 308 So.3d at 1201; see also **State v. Tran**, 98-2812 (La. App. 1st Cir. 11/5/99), 743 So.2d 1275, 1291, writ denied, 99-3380 (La. 5/26/00), 762 So.2d 1101.

In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See **Ordodi**, 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). To otherwise accept a hypothesis of innocence that was not unreasonably rejected by the fact finder, a court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (*per curiam*).

This assignment of error is without merit.

**CONVICTIONS AND SENTENCES AFFIRMED.**

14