Judgment rendered June 28, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,087-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                        Appellee

Versus

JOHNATHAN TRAYVON KELLY                   Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 365,695

Honorable Ramona L. Emanuel, Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Chad M. Ikerd

JOHNATHAN TRAYVON KELLY                  Pro Se

JAMES E. STEWART, SR.                    Counsel for Appellee
District Attorney

REBECCA A. EDWARDS
NANCY BERGER-SCHNEIDER
SAMUEL S. CRICHTON
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and ELLENDER, JJ.

**STEPHENS, J.**

This criminal appeal arises from the First Judicial District Court, Parish of Caddo, State of Louisiana, the Honorable Ramona Emanuel, Judge, presiding. On October 15, 2021, defendant, Johnathan Treyvon Kelly, was convicted by a unanimous jury of one count of manslaughter, a violation of La. R.S. 14:31, and was sentenced to 30 years' imprisonment at hard labor with credit for time served on February 24, 2022. Kelly has appealed his conviction, urging insufficiency of the evidence. For the reasons set forth below, we affirm Kelly's conviction and sentence.

## FACTS/PROCEDURAL BACKGROUND

The victim in this case, Marcus London, was killed because of a Facebook meme about the impact of makeup on the look of some women he posted to his page. His girlfriend, Symphanie Douglas, made a comment below London's post, writing, "some bitches need it." Apparently Elizabeth Wynn, a co-worker of London's, took offense to both his post and Ms. Douglas's comment, and the matter quickly escalated into a fight between Ms. Wynn and Ms. Douglas in the comment section of London's post. London attempted to defuse the situation by removing his original post before he left work. However, verbal threats later escalated into a physical confrontation between the women outside of London and Ms. Douglas's apartment.

After tagging Ms. Douglas in a Facebook live video of her and her sisters at knocking at Ms. Douglas's apartment door, Ms. Wynn, who lived in the same apartment complex, showed back up with her two sisters at the apartment Ms. Douglas and London shared. Ms. Douglas, rather than call the police, agreed to fight Ms. Wynn outside, even though she knew that the

Wynn girls often fought "as a group." A fight between the women ensued. London stepped in a few times to separate them. At one point, Ms. Douglas sprayed Mace in Ms. Wynn's face. London stepped in again to break up the fight and began dragging Ms. Douglas back upstairs toward their apartment in an attempt to end the fight for good.

As Ms. Douglas and London reached the top of the stairs on the balcony, she saw a vehicle pull up in front of their apartment. The passenger, who was wearing a dark hoodie and had dreadlocks, jumped out, armed with a gun. Ms. Douglas identified him as the defendant, Johnathan Kelly, whom she knew from elementary, middle, and high school. Ms. Douglas testified at trial that she was certain of Kelly's identity, even though she did not have her glasses on and the lighting conditions were poor. Ms. Douglas testified that after getting out of the car, Kelly then pointed his gun up towards London, who was standing on the balcony facing towards the gunman. Ms. Douglas dove for cover, but London was shot twice, once in the head and once in his lower back.

Ms. Douglas went inside to get London's phone to call 9-1-1, but police were already en route to the scene, having been called for a noise complaint. When officers arrived, Ms. Douglas identified Kelly as the shooter. Officers secured the scene and began their investigation. Ballistics evidence showed that the entry wound of the fatal shot to London's head came from the right side, consistent with it having been shot from a person who had just exited a car in front of the building. No bullets were ever recovered from the victim's body or the building; three spent .40 caliber rounds were located nearby. Furthermore, no gun was found.

2

On June 27, 2019, a Caddo Parish grand jury issued a bill of indictment charging defendant, Johnathan Treyvon Kelly, with the second degree murder of Marcus London, a violation of La. R.S. 14:30.1. Although London had been killed on November 20, 2017, and an arrest warrant had been issued for Kelly's arrest on that evening, Kelly was not arrested until he was located in Georgia in March of 2019.

Kelly's jury trial began on October 11, 2021. A unanimous jury found him guilty of the responsive verdict of manslaughter on October 15, 2021. Motions for new trial and post-verdict judgment of acquittal were filed on February 2, 2022, and denied after argument on February 23, 2022. On February 24, 2022, the trial court sentenced Kelly to 30 years at hard labor with credit for time served. A motion for reconsideration of sentence was denied on March 11, 2022. This appeal ensued.

## DISCUSSION

Both appellate counsel and defendant *pro se* have argued that the evidence put on by the State at trial was insufficient to support the jury's verdict of guilty of manslaughter.

According to defense counsel, the jury was only instructed on "specific intent" manslaughter as described in La. R.S. 14:31(A)(1) instead of both (A)(1) and the "felony/misdemeanor" manslaughter theory set forth in La. R.S. 14:31(A)(2). As such, the State was required to prove beyond a reasonable doubt that Kelly was the actual shooter, because to secure a conviction for "specific intent" manslaughter under La. R.S. 14:31(A)(1), the State had to prove both specific intent to kill and causation—the crime would be murder but a lesser conviction is allowed if reasonable mitigation exists to show that the person acted in sudden passion or heat of blood.

3

Because the facts presented at trial were not sufficient to prove the identification of the shooter as Kelly, his conviction for manslaughter must be reversed. Alternatively, if the facts were sufficient to prove Kelly's identity as *a* shooter, they were not sufficient to show that he inflicted the fatal shot and "caused" London's death. Either way, Kelly is not guilty, urges counsel.

Defendant argues that the evidence is insufficient to establish his guilt because the only evidence linking him to the crime was the eyewitness testimony of Symphanie Douglas. Kelly also points out the lack of evidence tying him to the apartment complex or a .40 caliber handgun, alleged to be the murder weapon.

The State contends that Kelly, indicted for second degree murder, was found guilty by a unanimous jury of the responsive verdict of manslaughter. However, the evidence presented at trial was sufficient to support a conviction for second degree murder. According to the State, Ms. Douglas's eyewitness identification taken alone is sufficient to support Kelly's conviction. Furthermore, the record proves beyond a reasonable doubt that Kelly was the shooter and negates any reasonable probability of misidentification. Because the evidence was sufficient to support a conviction for second degree murder, it is sufficient to support the responsive verdict of manslaughter. Alternatively, notes the State, the jury could have found that Kelly was provoked by London's intervention in the fight between the Wynn sisters and Ms. Douglas, and that Kelly's actions were mitigated such that the second degree murder was manslaughter.

*Applicable Law*

In assessing the sufficiency of the evidence, a reviewing court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Leger*, 17-2084 (La. 6/26/19), 284 So. 3d 609; *State v. Frost*, 53,312 (La. App. 2 Cir. 3/4/20), 293 So. 3d 708, *writ denied*, 20-00628 (La. 11/18/20), 304 So. 3d 416. The *Jackson* standard does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

The appellate court does not assess the credibility of witnesses or reweigh evidence, and accords great deference to the trier of fact's decision to accept or reject witness testimony in whole or in part. *State v. Frost*, *supra*. Where there is conflicting testimony about factual matters, the resolution of which depends upon the credibility of the witnesses, the issue is the weight of the evidence, not its sufficiency. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So. 2d 66, *cert. denied*, 543 U.S. 1023, 125 S. Ct. 658, 160 L. Ed. 2d 499 (2004); *State v. Gullette*, 43,032 (La. App. 2 Cir. 2/13/08), 975 So. 2d 753.

When the defendant claims he was not the person who committed the offense, the state is required to negate any reasonable probability of misidentification. *State v. Dorsey*, 10-0216, p. 43 (La. 9/7/11), 74 So. 3d 603, 633, *cert. denied*, 566 U.S. 930, 132 S. Ct. 1859, 182 L. Ed. 2d 658

5

(2012); *State v. Hughes*, 05-0992 (La. 11/29/06), 943 So. 2d 1047; *State v. Myrick*, 54,606, p. 7 (La. App. 2 Cir. 9/21/22), 349 So. 3d 92, 97. Positive identification by only one witness is sufficient to support a conviction. *State v. Hughes*, *supra.* It is the fact finder who weighs the respective credibility of the witnesses, and this court will generally not second-guess those determinations. *Id.*

La. R.S. 14:30.1 provides in pertinent part that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact; it may be inferred from the defendant's actions and the circumstances. *State v. Brown*, 03-0897 (La. 4/12/05), 907 So. 2d 1, *cert. denied*, 547 U.S. 1022, 126 S. Ct. 1569, 154 L. Ed. 2d 305 (2006); *State v. Kahey*, 436 So. 2d 475 (La. 1983); *State v. Ivory*, 54,886 (La. App. 2 Cir. 1/11/23), 355 So. 3d 1157; *State v. Lloyd*, 48,914 (La. App. 2 Cir. 1/14/15), 161 So. 3d 879, *writ denied*, 15-0307 (La. 11/30/15), 184 So. 3d 33. Deliberately pointing and firing a deadly weapon at close range are circumstances that will support a finding of specific intent to kill. *State v. Brown*, *supra*; *State v. Ivory*, *supra*. Specific intent to kill or inflict great bodily harm may also be inferred from the extent and severity of the victim's injuries. *Id.*; *State v. Odums*, 50,969 (La. App. 2 Cir. 11/30/16), 210 So. 3d 850, *writ denied*, 17-0296 (La. 11/13/17), 229 So. 3d 924.

Manslaughter is defined by La. R.S. 14:31(A)(1) as:

6

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

Manslaughter is a responsive verdict to second degree murder. La. C. Cr. P. art. 814. A factfinder may return any legislatively provided responsive verdict whether or not the evidence supports that verdict, as long as the evidence was sufficient to support a conviction of the charged offense. *State v. Wisely*, 34,482, p. 5 (La. App. 2 Cir. 2/28/01), 780 So. 2d 1230, 1233; *State v. Jasper*, 28,187 (La. App. 2 Cir. 6/26/96), 677 So. 2d 553, *writ denied*, 96-1897 (La. 2/21/97), 688 So. 2d 521. *See*, *State v. Taylor*, 14-0432, p. 12 (La. 3/17/15), 166 So. 3d 988; *State ex rel. Elaire v. Blackburn*, 424 So. 2d 246, *cert. denied*, 461 U.S. 959, 103 S. Ct. 2432, 77 L. Ed. 1318 (1983).

Flight and attempt to avoid apprehension indicate consciousness of guilt and therefore are circumstances from which a juror can infer guilt. *State v. Fuller*, 418 So. 2d 591 (La. 1982); *State v. Davies*, 350 So. 2d 586 (La. 1977); *State v. Neal*, 51,274 (La. App. 2 Cir. 5/2/17), 219 So. 3d 482, *writ denied*, 17-1028 (La. 3/2/18), 269 So. 3d 711; *State v. Wiggins*, 44,616 (La. App. 2 Cir. 9/23/09), 22 So. 3d 1039, *writ denied*, 09-2329 (La. 4/23/10), 34 So. 3d 271.

*Relevant Testimony*

The following witnesses are among those called by the State at trial. The defense did not call any witnesses, but did vigorously cross-examine those called by the prosecution.

7

Symphanie Douglas was the girlfriend of the victim, Marcus London. Ms. Douglas testified that she and London had lived in #210 at the Castlewood Apartments on West Bert Kouns about three years at the time of the shooting on November 20, 2017. Ms. Douglas stated that she and London met in 2014 when she graduated from high school; she and a friend were learning to ride horses, and he was their teacher. Marcus worked at the stables early in the mornings and at Crawdaddy's later as a cook. She was working at Office Depot, having just graduated from Remington College where she studied to be a medical assistant.

Ms. Douglas noted that both she and London had Facebook accounts and were active on social media. London worked with one of her cousins at Crawdaddy's, as well as with several other people she knew, including Elizabeth Wynn, a former acquaintance from Southwood High School. Ms. Douglas didn't think Ms. Wynn had friendly feelings towards her—"not at all." Ms. Douglas related that while in high school, Ms. Wynn and her sisters had "jumped" on a friend of hers. As Ms. Douglas put it, "[E]verybody knew about the Wynns. Because if you fought one, you had to fight all of them[.] [T]hat's just something that they did."

London sometimes worked "doubles." On those days, he went in to work at 10:00 a.m. and got off at 10:00 p.m. Ms. Douglas testified that they shared a car, and on the day of the shooting, November 20, 2017, she dropped London off early that morning and picked him up after he cleaned up and shut down the kitchen for the evening. They went straight home, getting there around 10:25 p.m. Ms. Douglas testified earlier that day, London had shared a Facebook post made up of about 30 different women's "before and after" faces, meaning with and without makeup. Ms. Douglas

8

noted that the contrasts were very obvious—some of the women didn't even look like the same people.  In response to the prosecutor's question of why London shared the post, Ms. Douglas responded that it was probably because he found it funny.

Ms. Douglas stated that she wrote a comment below London's post, "some bitches need it."  According to Ms. Douglas, all she meant was that some people needed makeup to make themselves look better.  She had no one in mind, and did not tag anyone, name names, or post anyone's photo. However, apparently Ms. Wynn took offense and commented on Ms. Douglas's post, believing that Ms. Douglas's comment was directed at her. Ms. Douglas testified that her comment was general, it was not aimed at Ms. Wynn—they weren't even friends on Facebook.

The prosecutor had Ms. Douglas read to the jury some of the later comments that were made by her and Ms. Wynn to show how their exchange had become personal to the point that they were threatening to get physical with each other.  Ms. Douglas's friend, the one who had fought Ms. Wynn in high school, had gotten involved as well.  Ms. Douglas stated that in an attempt to diffuse the situation, London took down his original post before he left work.

Ms. Douglas testified that when she and London got home that evening, he showered and sat down to watch tv and as she got ready to shower, she got on Facebook and saw that Ms. Wynn and two of her sisters were on Facebook live in front of their apartment door recording a video. After she got out of the shower, London told her he had heard them at the door, but didn't answer it.  He didn't tell her about it because he thought the women had gone.  Ms. Douglas stated that she had been tagged in the video,

so she tried to comment on it, but couldn't because it had apparently been deleted. All of this took place around 11:00 p.m.

According to Ms. Douglas, she and London then heard the sisters outside screaming her name and telling her to come downstairs. Ms. Douglas related that their apartment was on the second floor. In describing the complex layout, she noted that their apartment had a balcony it shares with other apartments on the upper level. There are exterior stairs down leading from the balcony into the parking lot. These stairs are located about three doors down from their unit, which was #210. She stated that she and London went outside because the Wynn sisters had come back.

Ms. Douglas and London stood on the balcony, talking back and forth with the women downstairs for about two minutes. Ms. Douglas testified that London was trying to prevent a fight, but the Wynns—Elizabeth and her sisters Erica and Deeona—weren't leaving. They ended up going downstairs, and that's when the altercation began. Ms. Douglas stated that the only other people around were neighbors "out looking." Ms. Douglas didn't observe that the sisters came in a car; she thinks they walked from Ms. Wynn's apartment in the back of the complex.

When she and Ms. Wynn started to fight, they were no longer in front of the apartment; they had migrated towards the dumpster in the parking lot. The sisters jumped in, even though London had warned them not to do so. London stepped in to pull the sisters off her and grabbed her to take her back upstairs. At that point Ms. Wynn and her sisters were standing by the apartment office. Ms. Wynn "ran back up on her," and they started fighting again. London grabbed her again, and Ms. Wynn stopped.

10

Ms. Douglas testified that she and London made it up the stairs and were at the front door of their apartment. The Wynn sisters were at the apartment office, and the women were still "talking crap" back and forth to each other. She observed Ms. Wynn on the phone talking to someone. London was digging around, looking for his keys to unlock their door when she saw a car pull up. Ms. Douglas testified that Johnathan [Kelly] jumped out and said, "You hit my girl, b*tch ass n*gg**," then shot. She stated that she thinks the car was a black Impala that was driven by someone else. Kelly hopped out of the passenger seat with a black handgun. As he was getting out, he was cocking the gun, getting ready to shoot. Ms. Douglas testified that Kelly shot three or four times while standing at the bottom of the balcony, about eight feet away. He then got back in the car and it took off.

As soon as the shots began, she took off running to the right; she assumed that London went left. When she got up, everybody had scattered. She went to check on London, who had buckled and fallen. He had a gunshot wound to his head. She took off her sweater and wrapped it around his head in an attempt to save him. She then dug around in his pockets to find his keys so she could go inside and look for his phone to call 9-1-1. When the officers arrived, they asked if she knew who shot him. She told them that she did and showed them the apartment where Kelly stayed with Ms. Wynn.

Ms. Douglas stated that she knew Kelly because they went to elementary, middle, and high school together. While they were in elementary school, her grandmother would pick him up and let him ride to school with them. Before the night of November 20, 2017, Ms. Douglas had

11

seen Kelly in the apartment complex because he stayed there with Ms. Wynn. Kelly knew London because Ms. Wynn worked with him at Crawdaddy's. Ms. Douglas testified that she was hurt and had feelings of regret for something so foolish that cost London his life. She then identified the defendant, Johnathan Kelly, as the person who shot and killed Marcus London.

On cross-examination, Ms. Douglas was adamant about her identification of Kelly as the shooter. She explained that she only caught a glimpse of the car because she saw the man whom she recognized as Kelly coming toward them with a gun. When asked about his appearance that night, Ms. Douglas stated that all she remembered is he had on a black hoodie that wasn't on his head, and he had dreadlocks like he had in high school. Ms. Douglas stated that she "most definitely" saw Kelly shoot the gun—he was pointing up, aiming directly at London.

Ms. Douglas was asked about Mace she deployed during her fight with the Wynn sisters. Ms. Douglas stated that she had a small container of Mace in her pocket during the altercation. She and Ms. Wynn had begun fighting again after a lull in the action. Ms. Douglas saw the other sisters running toward her. She pushed Ms. Wynn, who fell back. Ms. Douglas grabbed the Mace, sprayed it toward Ms. Wynn, and threw the container on the ground, then began fighting with Ms. Wynn again. Ms. Douglas said that she got Mace on her own face—she felt burning on her cheeks—and she also inhaled some of it. However, she was able to still see clearly. She estimates that this happened about five minutes before the shooting.

Ms. Wynn kept on fighting, so she did too. London had to pick her up and drag her up the stairs. The Wynn sisters were downstairs when the

shooting occurred. She and London were on the balcony. Ms. Douglas testified that she is nearsighted and wears glasses which help her focus on things that are at a distance. She had her glasses on when she walked out of the apartment that evening, but had taken them off and handed them to London before fighting Ms. Wynn. He still had her glasses when he was shot. When asked whether she had taken any drugs or had anything to drink the night of the shooting, Ms. Douglas stated that she doesn't drink or take drugs and had not taken any prescription drugs that night.

On redirect, Ms. Douglas stated that there is no doubt in her mind, having seen Kelly many times throughout her life, that the person she saw on November 20, 2017, shoot London was the defendant, Johnathan Kelly. In her words, "I could never forget his face." Regarding her glasses, Ms. Douglas testified that she does not wear her glasses all of the time and sees really well without them. When not wearing her glasses, she is able to recognize people from across the room. On the night of the shooting, she recognized Johnathan Kelly and heard his voice as he confronted London.

Dennis Moen testified that has resided at #211 in the Castlewood Apartments since 1994. He was Marcus London's next-door neighbor. On the night of the shooting, Moen had just gotten into bed when he heard a loud argument between two women that went on for a while. Because he lives in an apartment complex, he hears a lot of arguments, but this one went on so long he felt like something might develop. The argument was loud—it was about 30-40 yards from him and he heard it through a closed window. Moen heard the shots about five-ten minutes after he heard the comments. He testified that just as he was about to open the door, he hesitated and stepped back, noticing he had debris all over himself. The debris came from

13

the thermal insulation in the metal front door. According to Moen, two shots had come through his apartment—one through the wall, one through the door. He estimated the distance between the doors to his apartment, #211, and apartment #210 to be approximately 25 feet.

Kadedra Jackson ("Kadedra") testified that she lived in #110 in the Castlewood Apartments on the date of the shooting. The 9-1-1 calls from the night of November 20, 2017, were played for the jury, and she identified her voice in one of the calls. Kadedra testified that she looked out of her apartment window and saw an altercation in front of her building that night. She saw a girl, a gray Impala, and a man with dreads. As soon as the man got out of the car, he started shooting. The man with dreads was aiming a gun toward the top of the stairs. He fired the gun multiple times. Kadedra heard a girl scream several times. She screamed, "Marcus," and asked for help. Kadedra ran away from the window after she heard the shots fired.

The police contacted her and her sister Kenanna Jackson ("Kenanna"). They talked to her because she had called 9-1-1 and had seen the shooting outside her window. The police talked to her sister Kenanna because she had videoed part of the events. Kadedra testified that she couldn't identify the shooter because she had never seen him before.

Shreveport Police Officer Cody Hyde testified that he was a patrol officer in Area 4, which included Southern Hills, the area in which the Castlewood Apartments are located, on November 20, 2017. He received a loud noise complaint at 11:40 p.m. from that location and was a few minutes from the location when he was notified by Officer Jaudon they had a black male suffering from a gunshot wound. Upon arriving at the complex, Ofc. Hyde found the victim, Marcus London, identified as such by his girlfriend,

14

on the balcony in front of his apartment, #210, with gunshot wounds to his head and back.  Ofc. Hyde observed two bullet holes directly behind where the victim was lying—one in the wall and one in a door.

When Ofc. Hyde spoke with Symphanie Douglas, the victim's girlfriend, she was clearly upset and shaken, but very coherent.  She gave him a statement at the scene.  Ms. Douglas told him that she had been in an altercation over Facebook with a Miss Elizabeth Wynn.  A few minutes prior to the officers' arrival, Ms. Wynn and her sisters had come to her apartment wanting to fight.  Ms. Douglas and Marcus London exited their apartment and told them to leave.  After the women's altercation, a heavyset black male with long dreads they have known for a long time, identified as Johnathan Kelly, got out of the car, a black Impala, with a black handgun and from the parking lot started firing at them on the balcony.  Ofc. Hyde stated that Ms. Douglas showed no hesitation in identifying Kelly as the shooter.

Ofc. Hyde testified that, because he had been dispatched to the complex about 15-20 times as a patrol officer, he was familiar with its layout.  He estimated that the second story is about 20 feet from the ground level, and the distance from the parking lot to the balcony is about the same distance.  When asked to describe the complex's lighting conditions, he noted that there was lighting around the parking lot and lights by each apartment door.  Corporal Zachary Johnson, another Shreveport Police Officer assigned to patrol in Area 4, testified to his familiarity with the Castlewood Apartments.  Cpl. Johnson described the apartment complex as having a "very well lit" parking lot.

15

Garrett Hill testified that in 2017, he was assigned to the Violent Crimes and Homicide Division of the Shreveport Police Department, and he was the investigator assigned to the November 20, 2017, shooting of Marcus London. Detective Hill testified to as to the details of his investigation, including his search of the Castlewood Apartments parking lot with SPD Crime Scene Investigations ("CSI") Officer Betsy Pickett (now Huey). Det. Hill stated that he and Ofc. Huey found multiple .40 caliber shell casings in the parking lot. Det. Hill also testified to Ms. Douglas's description of the shooter as a black male with dreadlocks and identification of the perpetrator as Johnathan Kelly. Ms. Douglas related to Det. Hill that she knew Kelly from growing up in the same neighborhood and going to school together. When Det. Hill showed a photograph to Ms. Douglas, she identified the person in the photo as Kelly.

Det. Hill testified that he interviewed Kenanna, sister of Kadedra, who lived in the apartment just below Symphanie Douglas and the victim, Marcus London. Kenanna described hearing tires screech in the parking lot. She saw a dark-colored car, possibly an Impala, and saw a black male with dreadlocks exit the vehicle. Kenanna stated that she heard the male talking to one of the females in the parking lot. Kenanna also had a cell phone video of the incident which corroborated her statement. Det. Hill stated that Kenanna sent this video to his city email address, and he watched it. He saw a black male with long dreadlocks firing a weapon. Det. Hill described the video as "[V]ery dark, and you could only see outlines." The recording, however, was corrupted once it was downloaded so he was unable to save it.

Det. Hill stated that he also interviewed Kadedra, who told him that she saw a dark or silver colored vehicle and a black male with dreads in the

16

parking lot. She heard the man and a woman in the parking lot talking.[1] Kadedra told him that she did not see the shooting because she ran or ducked when she heard them. Kadedra said that she heard three shots, which is consistent with the number of .40 caliber shell casings they found in the parking lot. Det. Hill testified that the location of the shooting as described by Kadedra, Kenanna, and Ms. Douglas corresponded to where the shell casings were found.

Det. Hill stated that he drafted an arrest warrant for Kelly and the police searched Ms. Wynn's apartment. They found a gun case and ammunition for a 9 mm, but did not recover a .40 caliber weapon. According to Det. Hill, they never located any evidence that a 9 mm handgun had been used in the shooting. Det. Hill noted that law enforcement was unable to locate either Ms. Wynn or Kelly as long as he remained with the Shreveport Police Department, which was through 2019. Det. Hill testified that Ms. Wynn was not identified as a suspect in the shooting, and the only suspect ever developed was Johnathan Kelly.

Detective Logan McDonald testified that he was the primary on-call detective with Shreveport Police Department the week of November 20, 2017. Although Det. Hill was lead detective, Det. McDonald assisted in the investigation until taking over in 2019 when Kelly was apprehended and arrested in Georgia. When he got to the scene, it was some time after midnight on November 21. Det. McDonald stated that there were at least two defects caused by gunfire in the apartment structure near apartments

---

[1] Det. Hill was not allowed to testify as to the contents of the conversation overheard by Kadedra.

17

#210 and #211. He noted that the .40 caliber shell casings were recovered from the parking lot just below the balcony where Marcus London was shot.

When asked on cross-examination whether CSI requested fingerprint or DNA analysis on the bullet casings, Det. McDonald pointed out that the crime lab requires that there be reference samples submitted for comparison, which could not be done in this case, as they had no suspect in custody. He noted that Kelly wasn't booked into Caddo Correctional Center until March 21, 2019. Det. McDonald also confirmed that during their investigation, they did not locate a 9 mm gun or any bullet casings or cartridges for a 9 mm to indicate that such a weapon was used by Kelly.

CSI Officer Betsy Pickett Huey testified that the condition of each of the three .40 caliber casings they found in the parking lot was shiny and pristine and had no defect from being stepped on or run over by a car. The crime lab report, prepared by Carla White, states that the three .40 caliber cartridge cases were fired by one weapon. According to Ofc. Huey, in order for the lab to determine what firearm was used to fire the casings, the lab requires a gun for comparison.

Dr. Long Jin, a forensic pathologist at LSU Oschner Hospital, performed the autopsy on Marcus London for the Caddo Coroner's Office. Dr. Jin testified that London's cause of death was a perforating gunshot wound to the head, and the manner of death was homicide. According to Dr. Jin, the bullet passed all the way through. The entry wound was above London's right ear on his right temple, and the exit wound was on the left occipital area of his head. Dr. Jin opined that the trajectory was from right to left, front to back, slightly from the bottom to the top, indicating that the gun used was lower than the level of the victim's head.

*Analysis*

A grand jury indicted Kelly for second degree murder, which, as applies to this case, is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm.  La. R.S. 14:30.1(A).  The jury returned a responsive verdict of manslaughter, which they were instructed is a homicide that would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of self-control and cool reflection.  La. R.S. 14:31(A)(1).

Kelly attacked Ms. Douglas's identification of him as the shooter as flawed.  Ms. Douglas positively identified him as the shooter from the beginning.  According to Ms. Douglas, Kelly jumped out of a vehicle that pulled up soon after her fight with Ms. Wynn and her sisters, armed with a black handgun, shouted at London, "You hit my girl, you b*tch ass n*gg**," then opened fire.  Ms. Douglas further testified that she has known Kelly from a young age—not just from growing up in the same neighborhood, but from attending elementary, middle, and high school with him.  She knew that he was dating Ms. Wynn and stayed with her at the Castlewood Apartments.  Ms. Douglas had seen them together at the complex, had spoken to Kelly there, and knew what apartment in which they were living.  In fact, she was able to recognize his voice when he spoke prior to shooting at London that night.

Ms. Douglas testified that she knew and recognized Kelly even though it was nighttime, based not just on his voice but on his appearance— he has had the same hairstyle since high school, dreadlocks, and was wearing a black sweatshirt.  While Ms. Douglas has prescription glasses, her

19

testimony was that she does not wear them all of the time, but can see very well without them. According to Ms. Douglas, she could recognize people at the distance from which Kelly was firing his weapon. Although she had gotten some of the Mace she had sprayed while fighting the three sisters on her own face, she was able to see—well enough to walk upstairs ahead of London after he broke up the fight. She was also able to tend to him after the shooting and speak with the officers as they responded to the scene. Great deference is owed to the jury's determination that her identification was credible and reliable, and nothing on this record warrants this Court's second-guessing the jury's credibility determination. Ms. Douglas's very detailed and consistent testimony, believed by the jury, is sufficient support for the requisite factual conclusion regarding Kelly's identity as the shooter.

The other evidence supporting the jury's verdict includes Kadedra and Kenanna Jackson's description of the shooter as a man with dreadlocks, and Kadedra's testimony that the shooter aimed a gun upwards, firing multiple times. Furthermore, immediately after London's murder, Kelly and Ms. Wynn fled, unable to be found for more than two years. Regarding manner and cause of death, it was Dr. Jin's testimony that Marcus London was killed by the bullet that struck his head and that his cause of death was homicide. Dr. Jin further stated that the firearm was angled upwards when it was fired.

As noted above, the general rule is that if the evidence adduced at trial is sufficient to support a conviction of the charged offense, then a responsive verdict is authorized. *See, State v. Taylor*, *supra*; *State v. Wisely*, *supra*. Thus, to obtain a conviction for second degree murder, the offense charged, the State had only to prove that the defendant, Johnathan Kelly, killed the victim, Marcus London, with the specific intent to kill or to inflict great

20

bodily harm. *Id*; *State v. Curtis*, 11-1676, p. 15 (La. App. 4 Cir. 3/13/13), 112 So. 3d 323, 333, *writs denied*, 13-0831, 13-0878 (La. 11/1/13), 125 So. 3d 419, 420, *cert. denied*, 572 U.S. 1090, 134 S. Ct. 1939, 188 L. Ed. 2d 965 (2014). The testimony of eyewitness Symphanie Douglas, which negates any reasonable probability of misidentification, together with the other evidence introduced by the State, was sufficient to establish that Kelly was the shooter, and he shot London with the specific intent to kill or inflict great bodily harm when he fired upwards from the parking lot towards the balcony on which London and Ms. Douglas were standing. The elements of second degree murder were proved beyond a reasonable doubt and therefore, the statutorily-authorized responsive verdict of manslaughter was properly returned by the jury. Kelly's words and his actions in firing a gun upwards towards London multiple times indicate that he actively desired to cause the death of or inflict great bodily harm upon the man he thought had put hands on his girlfriend.

We next address Kelly's *pro se* assignment of error that his trial attorney provided him with ineffective assistance of counsel. We note that Kelly has alleged that his trial counsel failed to:

- subpoena witnesses (Elizabeth Wynn, Deeona Wynn, and Erika Wynn) to testify on his behalf;
- file any motions on his behalf, such as a motion for suppression of evidence, a motion to suppress a statement, a motion in limine, or any other evidentiary motions;
- investigate, gather evidence, and introduce evidence that was essential to the "defense alibi" at trial; and
- interview any witnesses, police officers, or crime scene investigators involved in the case that could have been essential to his defense.

21

There is no further briefing or discussion on this issue by Kelly.

*Applicable Law*

Claims of ineffective assistance of counsel are more properly raised in an application for post-conviction relief ("PCR") in the trial court because it provides the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930.8. However, when the record is sufficient, allegations of ineffective assistance of counsel may be resolved on direct appeal in the interest of judicial economy. *State v. Diaz*, 612 So. 2d 1019 (La. 1993); *State ex rel. Bailey v. City of West Monroe*, 418 So. 2d 570 (La. 1982); *State v. Ward*, 53,969 (La. App. 2 Cir. 6/30/21), 324 So. 3d 231.

A claim of ineffective assistance of counsel requires a showing of two things: that the defense counsel failed to perform and that this failure to perform prejudiced the defendant. The test, as set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), is that a conviction will be reversed if the petitioner proves that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. *State v. Legrand*, 02-1462 (La. 12/3/03), 864 So. 2d 89, *cert. denied*, 544 U.S. 947, 125 S. Ct. 1692, 161 L. Ed. 2d 523 (2005); *State v. Washington*, 491 So. 2d 1337 (La. 1986).

The assessment of an attorney's performance requires that his conduct be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming that he has

exercised reasonable professional judgment. *State v. Ward*, *supra*; *State v. Vallo*, 51,046 (La. App. 2 Cir. 1/11/17), 212 So. 3d 1198.

A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel that led to the claim; general statements and conclusory charges will not suffice. *Strickland*, *supra*; *State v. Ward*, *supra*.

*Analysis*

Defendant has gone no further than making these bare allegations, and all four of them fall into the category of matters of strategy. As such, Kelly's claims are more appropriate for PCR. This gives Kelly the time to more fully develop and support, if he can, his ineffective assistance claims properly in an application for PCR. *See*, La. C. Cr. P. arts. 924, *et seq*.

## CONCLUSION

For the reasons set forth above, the conviction and sentence of the defendant, Johnathan Kelly, are affirmed.

**AFFIRMED.**